(8 P.3d 1282)
No. 82,627

STATE OF KANSAS, *Appellee*, v. CLARENCE JONES, *Appellant*.

—

Opinion filed August 11, 2000.

*Michael Redmon,* of Kansas City, for the appellant.

*Sheryl Lidtke* and *Matthew J. Brock,* assistant district attorneys, *Nick A. Tomasic,* district attorney, and *Carla J. Stovall,* attorney general, for the appellee.

Before PIERRON, P.J., GERNON, J., and RICHARD M. SMITH, District Judge, assigned.

SMITH, J.: Clarence Jones appeals his conviction of unintentional second-degree murder. We reverse and remand for a new trial.

On February 4, 1998, Clarence Jones, age 15, shot and killed Justin Stanley, age 16. The events that led up to this tragic event began that morning in a music class attended by both young men. A disruption occurred where Stanley threatened other members of the class. He was sent to the office for his behavior. Apparently Jones had laughed at Stanley sometime during the incident. Before leaving school, Stanley and some other individuals confronted Jones, trying to pick a fight. Stanley threatened Jones, but Jones walked away. Jones reported the incident to a school security officer and a school administrator. He told the school administrator that he would like to leave school early because he was afraid of Stanley. Jones was granted a pass to go home. Jones took a circuitous route home out of fear that Stanley might be waiting for him.

Jones made it home without event and was playing video games when Stanley and his friends arrived at Jones' home. Jones' sister answered the door and told them Jones was not there. Upon hearing Stanley argue with his sister, Jones went to the door and asked Stanley why they were fighting. Stanley threatened Jones. Jones told Stanley he did not have time for fighting and shut the door. Stanley tried to force his way in and threatened to kill Jones and "spray-up" his house. Stanley then left.

Jones believed Stanley's threats. He went to his grandmother's home a half block away and called his mother. His mother said she

would leave work and come directly home. In the meantime, a friend arrived and told Jones that Stanley and his friends were in a car looking for him and they had a gun.

Jones' mother arrived and took the children to NationsBank to get a key from a relative who worked there. She planned to take Jones and his sisters to a relative's house where they would be safe. As Jones headed into the bank to be with his mother, a neighbor, Marcus Tillman, appeared. Tillman gave Jones a gun as he was heading into the bank. Jones later testified that he was unfamiliar with guns and their use.

While Jones, his mother, and his sisters were at the bank, Stanley arrived. Jones' mother, Stanley, and other individuals began to argue. Jones shot the gun once into the air. Stanley then said, "You f—k up. You pulled this rooty tooty ass gun on me. I got something for you," and went to the trunk of his car. Jones told Stanley to back away from the car, which he did. Jones did not believe at this time that Stanley had retrieved a gun, so Jones put his gun away in his mother's car.

The verbal altercations continued. Jones repeatedly asked Stanley what they were fighting about and Jones' mother asked Stanley why he was bothering her son. She told Jones to go inside the bank and he did. Stanley's brother arrived in another automobile, jumped out, made some comments, and then swung and hit Jones' sister, knocking her to the ground. Seeing this, Jones came out of the bank. The individuals with Stanley began closing in on Jones. Jones testified he asked them to leave him alone and they responded, "f—k that." Jones went to his mother's car, got the gun, and began shooting. Jones testified he fired several shots because they seemed to keep coming at him and he thought he saw Stanley reach for a gun. As Jones shot the gun, the individuals turned and ran away. Stanley was shot once in the back of the head and later died at a hospital. No gun was found on Stanley.

At trial considerable effort was spent by the defense placing Jones' character in issue. The evidence indicated Jones had no prior record for arrests or convictions. He was not involved in gangs and did not use illegal drugs. He attended church every Sunday, liked music, and played various musical instruments. The music teacher

in charge of the class where the dispute began testified that Jones was not the type to cause trouble or fight and described Jones as well-mannered, soft-spoken, friendly, and likable. A police officer testified that Jones was respectful, honest, and nonviolent. The vice-president of the Wyandotte High School junior class testified that Jones had a reputation for being honest and nonviolent, and for not being involved in gangs, drugs, and fights. Another police officer testified that Jones was a good kid with a good demeanor and was always smiling. One character witness testified that Jones was a very respectful person, very intelligent, well-mannered, never got in trouble, stayed in school, and was the type of person that a mother would want her son to be.

Jones asserted self-defense. He testified he was afraid of Stanley because Stanley was bigger and weighed approximately 100 pounds more than Jones. Jones testified he was afraid of Stanley because, prior to the shooting, Stanley had robbed the occupants of a house at gunpoint and Jones was among the individuals who had been robbed of some minor personal property. Jones also presented evidence indicating that Stanley was a violent person who sold drugs.

Further specific facts in evidence will be reviewed as necessary to consider the pertinent issues on appeal.

In his appeal, Jones raises multiple issues. The issues necessary for consideration will be addressed in the following order: (1) Did the trial court err in giving an instruction on unintentional second-degree murder; (2) did the court err in failing to instruct on imperfect self-defense; and (3) did the trial court err in admitting specific instances of bad conduct by Jones and in admitting a photograph of an assault weapon?

Jones argues the court erred in instructing the jury on the lesser included offense of unintentional second-degree murder. K.S.A. 1999 Supp. 21-3402(b).

Jones was charged with intentional second-degree murder, 1999 K.S.A. Supp. 21-3402(a). The trial court, on its own motion, instructed the jury on the lesser included offense of unintentional second-degree murder. Unintentional second-degree murder is "the killing of a human being committed . . . unintentionally but recklessly under circumstances manifesting extreme indifference

to the value of human life." 1999 K.S.A. Supp. 21-3402(b). "The trial court has an affirmative duty to instruct the jury on all lesser included offenses which are supported by the evidence. Instructions on lesser included offenses must be given even though the evidence supporting those offenses may not be strong." *State v. Alderson*, 260 Kan. 445, Syl. ¶ 8, 922 P.2d 435 (1996). Thus, the two-fold question is presented: Is unintentional second-degree murder a lesser included offense of intentional second-degree murder and, if so, did the evidence support the giving of the instruction?

Intentional second-degree murder is a lesser degree of first-degree murder, and, therefore, an included offense. K.S.A. 1999 Supp. 21-3107(2)(a). Unintentional second-degree murder is a lesser included crime of first-degree murder. *State v. Pierce*, 260 Kan. 859, 864-65, 927 P.2d 929 (1996).

"Reckless second-degree murder is distinguished from first-degree murder ('intentionally and with premeditation,' K.S.A. 21-3401[a]) and intentional second-degree murder by the level of intent required. In his treatise, Professor LaFave explains:

'Extremely negligent conduct, which creates what a reasonable [person] would realize to be not only an unjustifiable but also a very high degree of risk of death or serious bodily injury to another or to others—though unaccompanied by any intent to kill or do serious bodily injury—and which actually causes the death of another, may constitute [depraved heart] murder.' 2 LaFave, Substantive Criminal Law § 7.4 (1986).

"Reckless second-degree murder is similar in nature to involuntary manslaughter, K.S.A. 21-3404(a), which requires a level of recklessness resulting in death." 260 Kan. at 864

It is a long-recognized principle that manslaughter is a lesser degree of homicide, which can be a lesser included offense of either first- or second-degree intentional murder. *State v. Gregory*, 218 Kan. 180, 542 P.2d 1051 (1975). The Kansas Supreme Court described the delineation between unintentional second-degree murder and manslaughter in *State v. Robinson*, 261 Kan. 865, Syl. ¶ 5, 934 P.2d 38 (1997):

"Depraved heart second-degree murder requires a conscious disregard of the risk, sufficient under the circumstances, to manifest extreme indifference to the

value of human life. Recklessness that can be assimilated to purpose or knowledge is treated as depraved heart second-degree murder, and less extreme recklessness is punished as manslaughter. Conviction of depraved heart second-degree murder requires proof that the defendant acted recklessly under circumstances manifesting extreme indifference to the value of human life. This language describes a kind of culpability that differs in degree but not in kind from the ordinary recklessness required for manslaughter."

Since depraved heart murder differs only in degree, but not in kind, from the recklessness required by manslaughter and it is distinguished from first-degree murder and intentional second-degree murder by the level of intent required, it stands to reason that unintentional second-degree or depraved heart murder is an included offense of intentional second-degree murder when there is evidence to support both intent and recklessness.

One independent witness, a NationsBank employee, testified that Jones fired the gun randomly, waiving his arm back and forth towards a group of people at the far end of the parking lot. Another witness who was using the ATM machine during the incident testified that Jones shot the gun randomly and without aiming. Jones testified he closed his eyes and aimed over the heads of the crowd across the parking lot in an attempt to scare them off. The evidence, therefore, could have supported a finding of reckless behavior under circumstances manifesting an extreme indifference to human life.

The instruction was required and proper.

Jones next argues he was entitled to an instruction on the doctrine of imperfect self-defense. Jones did not request this instruction at trial. The standard of review is clear error. K.S.A. 1999 Supp. 22-3414(3) provides in pertinent part:

"In cases in where there is some evidence which would reasonably justify a conviction of some lesser included crime as provided in subsection (2) of K.S.A. 21-3107 and amendments thereto, the judge shall instruct the jury as to the crime charged and any such lesser included crime.

. . . .

"No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects thereto before the jury retires to consider its verdict stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction or the failure to give an instruction is clearly erroneous."

Instructions are clearly erroneous only if the reviewing court is firmly convinced there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *State v. Henry*, 263 Kan. 118, 131, 947 P.2d 1020 (1997); *State v. Eickman*, 26 Kan. App. 2d 527, 530-31, 989 P.2d 795 (1999).

Imperfect self-defense is an intentional killing committed with an unreasonable but honest belief that circumstances justified deadly force. This lesser degree of homicide is codified in K.S.A. 21-3403(b), which provides that voluntary manslaughter is the intentional killing of a human being committed "upon an unreasonable but honest belief that circumstances existed that justified deadly force under K.S.A. 21-3211, 21-3212, or 21-3213 and amendments thereto."

The Kansas Supreme Court explained the history behind this statutory provision in *State v. Ordway*, 261 Kan. 776, 787-88, 934 P.2d 94 (1997):

"Legislative history of K.S.A. 21-3403 shows that the definition of voluntary manslaughter was expanded by the addition of subsection (b) in 1992. L. 1992, ch. 298, § 5. Until then, the statute defined voluntary manslaughter as an intentional killing upon a sudden quarrel or in the heat of passion. Notes on proposed criminal code revisions were attached to the minutes of the Senate Judiciary Committee from March 22, 1992, which contained the following comments about subsection (b) of 21-3403:

'(b) "Imperfect right to self-defense" manslaughter.

'This new subsection covers intentional killings that result from an unreasonable but honest belief that deadly force was justified in self-defense. In essence, the defendant meets the subjective, but not the objective, test for self-defense. This so-called "imperfect right to self-defense" is recognized in various forms. Kansas apparently recognizes it for unintentional killings under involuntary manslaughter. [Citations omitted.] The Model Penal Code also follows this approach. Some states, e.g. Illinois, recognize this partial defense for intentional killings. *See*, LaFave, Criminal Law pp. 665-666. (1986).

'Applying this partial defense to intentional killings is simply a recognition of the practical realities of plea bargaining and jury verdicts. Often it is unjust to prosecute and convict such killers of murder and it is equally unjust to acquit them. This new subsection provides a middle category that is theoretically sound and legitimizes the realities of plea bargaining and jury verdicts.' "

In this case, the jury was instructed on intentional second-degree murder, unintentional second-degree murder, voluntary man-

slaughter, and involuntary manslaughter. The trial court instructed the jury on voluntary manslaughter as a lesser included offense of second-degree murder as follows:

"In considering whether the defendant is guilty of murder in the second-degree you should also consider the lesser offense of voluntary man- slaughter. If there is a reasonable doubt as to which of these two offenses the defendant is guilty, the defendant may be convicted of voluntary manslaughter only.

"To establish this charge each of the following claims must be proved:

"1. The defendant intentionally killed Justin Stanley,

"2. *That it was done upon sudden quarrel or in the heat of passion;*

"3. That this act occurred on or about the 4th day of February, 1998, in Wyandotte County, Kansas. [Emphasis added]."

The court's instructions defined heat of passions as follows:

"As used in these instructions, the following terms have the following definitions:

. . . .

(b) Heat of Passion

"Heat of Passion means any intense or vehement emotional excitement which was spontaneously provoked from circumstances. Such emotional state of mind must be of such degree as would cause an ordinary person to act on impulse without reflection."

There was no evidence of a spontaneously provoked intense or vehement emotional excitement. The instruction on that form of voluntary manslaughter was error. The court failed to instruct upon the applicable form of voluntary manslaughter based upon imperfect self-defense. Where evidence is admitted that a killing is done under the mitigating circumstances of an unreasonable but honest belief that deadly force is necessary, it is error to fail to so instruct. See *State v. McCown,* 264 Kan. 655, Syl. ¶ 3, 957 P.2d 401, *cert. denied* 525 U.S. 1019 (1998). The question is whether instructing on the wrong form of voluntary manslaughter and failing to instruct on imperfect self-defense constituted clear error.

The entire theory of the State's case supported by the evidence was that Jones intentionally killed Stanley without premeditation. This was based upon how and when Jones went to the car and got the gun, how he kept shooting even though Stanley's group ran away, and the fact that Stanley's wound was to the back of his head. The defense was one of pure self-defense supported by substantial

evidence. The jury was instructed on intentional second-degree murder, unintentional second-degree murder, voluntary manslaughter based upon sudden quarrel/heat of passion, and involuntary manslaughter. The jury was never properly instructed, that if it believed the killing was intentional, done under the honest but unreasonable belief that deadly force was justified, then Jones could only be convicted of voluntary manslaughter.

This court is firmly convinced that if the jury had been properly instructed, there is a real possibility it would have rendered a different verdict. Evidence was admitted which would have supported a verdict of intentional second-degree murder. Jones presented evidence in support of self-defense. Obviously, the jury chose a middle ground between the positions of the State and Jones. Had the jury been provided the specific option which the legislature intended and best fit the facts as proved, there is a real possibility of a different verdict. Failure to instruct on voluntary manslaughter based upon imperfect self-defense was clear error in this case.

Two additional issues raised in Jones' appeal deserve mention. Both concern the admission of evidence which Jones argues was improperly admitted and was prejudicial.

In the original complaint, Jones was charged with an additional count of terroristic threat. This charge related to an alleged threat made the evening of February 4, 1998. Shana Boyer, Stanley's sister, alleged that someone had called her home that evening and threatened to kill her father and burn down her house. She stated the caller never identified himself, but she believed it was Jones. The charge was dismissed at preliminary hearing when Boyer failed to appear. Prior to trial, Jones filed a motion in limine to prevent the State from mentioning this incident in opening statement or presenting the evidence in the State's case in chief. Jones argued this was not part of the *res gestae*, but rather, evidence of another crime. The trial court sustained the motion in limine and prevented the State from offering the evidence of the phone call at the time of trial.

At the time of Boyer's testimony at trial, however, the State approached the bench and proffered the testimony of the phone call. Jones objected to its admissibility, and the trial court reversed

its previous ruling and deemed the evidence admissible because Jones had put his character into issue.

K.S.A. 60-446 provides: "When a person's character or a trait of his or her character is in issue, it may be proved by testimony in the form of opinion, evidence of reputation, or evidence of specific instances of the person's conduct, subject, however, to the limitations of K.S.A. 60-447 and 60-448." The exceptions pertinent to this rule are found in K.S.A. 60-447, which provides in pertinent part: "(a) evidence of specific instances of conduct other than evidence of conviction of a crime which tends to prove the trait to be bad shall be inadmissible."

Jones admits he put his character at issue and relied heavily on evidence of his nonviolent nature. When the defendant introduces evidence of his or her good character, the defendant waives the protection provided by K.S.A. 60-447 and allows the State to introduce evidence of a trait of the accused's character as tending to prove guilt of the offense charged. See *State v. Blackburn*, 251 Kan. 787, 792, 840 P.2d 497 (1992). However, evidence of specific conduct other than evidence of the conviction of a crime is inadmissible. *State v. Deavers*, 252 Kan. 149, 156-57, 843 P.2d 695 (1992), *cert. denied* 508 U.S. 978 (1993). As there was no conviction from the events surrounding the phone call, testimony about it constituted inadmissible specific conduct. Although Boyer admitted the caller never specifically identified himself, her testimony was prejudicial.

The second evidentiary issue on appeal concerns Marcus Tillman. Tillman corroborated that Stanley had gone to Jones' home before the shooting. He testified that Stanley had stated, "I'm a killer," and he had threatened to bring a gun and shoot up Jones' house. Tillman gave the gun to Jones at the bank. Further, Tillman testified that Jones had started to leave during the argument at the bank, but changed his mind because he did not want to leave his mother.

The police searched Tillman's home after the shooting. They found an assault weapon in Tillman's possession and took a photograph of it. The photograph was admitted as a State's exhibit.

When the State proffered the exhibit, Jones objected on grounds of relevance, which was overruled.

Except as otherwise provided by statute, constitutional prohibition, or court decision, all relevant evidence is admissible. K.S.A. 60-407(f). "Relevant evidence" is defined as "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). The assault weapon was not the gun used in the shooting or in any of the conflicts between Jones and Stanley. The weapon was not at the scene. The only apparent tactical purpose in the admission of the photograph was to diminish Tillman's credibility. The admission of the photograph represented an improper attack on Tillman's credibility. Its prejudicial effect outweighed any probative value. It was error to admit the photograph of the assault weapon.

Reversed and remanded for new trial.